**BROOKS GAS CORPORATION,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent,

Sinclair Oil and Gas Company, Skelly Oil
Company, Texaco, Inc., and Mallard
Petroleum, Inc., Intervenors.

No. 20430.

United States Court of Appeals
District of Columbia Circuit.

Argued March 3, 1967.

Decided Aug. 1, 1967.

Mr. Joseph C. Swidler, Washington, D. C., with whom Mr. S. David Freeman, Washington, D. C., was on the brief, for petitioner.

Mr. Israel Convisser, Atty., F. P. C., with whom Messrs. Richard A. Solomon, Gen. Counsel, Howard E. Wahrenbrock, Sol. at the time the brief was filed, and Peter H. Schiff, Deputy Sol., F. P. C., were on the brief, for respondent.

Mr. Charles E. McGee, Washington, D. C., with whom Mr. John T. Ketcham, Washington, D. C., was on the brief for intervenor Sinclair Oil & Gas Co., argued for all intervenors.

Messrs. Sherman S. Poland and James D. McKinney, Jr., Washington, D. C., were on the brief for intervenor Skelly Oil Co.

Mr. William K. Tell, Jr., Houston, Tex., was on the brief for intervenor Texaco, Inc.

Mr. Jerome J. McGrath, Washington, D. C., was on the brief for intervenor Mallard Petroleum, Inc.

Before FAHY,* BURGER and TAMM, Circuit Judges.

TAMM, Circuit Judge:

## I

Petitioner Brooks Gas Corporation (hereinafter Brooks Gas) operates, under a producer certificate, facilities which gather natural gas from 13 wells in the Eldorado gas field in Schleicher County, Texas. Petitioner transports this gas in its own pipeline to an interconnection with the Brooks Pipeline Company (hereinafter Brooks Pipeline) approximately 11 miles to the north of the Eldorado field; from which point, Brooks Pipeline transports the gas approximately 18 miles to the Mertzon processing plant. Brooks Pipeline is a wholly owned subsidiary of Brooks Gas. Brooks Gas also owns a 72 per cent interest in the Mertzon processing plant. Hydrocarbons are extracted from the natural gas at the Mertzon plant, and the residue gas is delivered to Northern Gas Pipeline Company (hereinafter Northern Pipeline) at the tailgate of the Mertzon plant. The pipeline operated by Brooks Pipeline operates under a certificate granted by the Federal Power Commission (hereinafter the Commission), which classified the facility a "pipeline" (32 F.P.C. 563 (1964)). This certificate allows Brooks Pipeline to transport up to 20,000 Mcf of gas per day. The present level being carried is only 14,000 Mcf, however, and petitioner claims that the 6,000 Mcf of unused capacity is available for use by intervenor Sinclair Oil and Gas Company (hereinafter Sinclair) to transport gas from wells being developed by Sinclair to the Mertzon processing plant of Brooks Gas. Rather than using these facilities of Brooks Gas and Brooks Pipeline, Sinclair, under temporary authority granted by the Commission, built a gathering network to connect its wells in the Eldorado field and connected this to its own processing plant by an 11 mile pipeline.

Petitioner now appeals from the grant of this authority to Sinclair by the Commission. Petitioner claims that the grant of temporary authorization was in violation of section 7(c) of the Natural Gas Act[1] and the Commission's regulations. We do not agree, and we affirm the Commission's grant of temporary authority.

---

* Circuit Judge Fahy became Senior Circuit Judge on April 13, 1967.

[1]. 15 U.S.C. § 717f(c) (1963).

## II

On November 15, 1965, Sinclair filed an application with the Commission for a certificate of convenience and necessity under section 7(c) of the Act and sections 157.23–28 of the Commission's regulations [2] on behalf of itself and Skelly Oil Company to sell additional gas to Northern Pipeline and Northern Natural Gas Company (hereinafter Northern Gas) at the tailgate of Sinclair's Eldorado processing plant, which is owned 50 per cent by Sinclair and 50 per cent by Skelly Oil Company. Northern Pipeline would carry the additional gas to the pipeline owned by Northern Gas, which would transport it to the ultimate consumers in the middle west. Northern Pipeline is a subsidiary of Northern Gas. Sinclair's Eldorado plant has been in operation for 10 years, and the sale of gas in the past to Northern Gas by Sinclair was under Commission gas rate schedule No. 90. Such sale was certified a producer sale in Commission Docket No. G–11414. Sinclair entered into the new contract for which it now seeks a certificate with Northern Pipeline and Northern Gas and committed additional reserves and future production for 20 years from fields in a seven-county area surrounding its Eldorado plant. Included in this contract was gas to be produced by Sinclair and Skelly Oil Company in the Eldorado field. This contract had escalation clauses calling eventually for delivery of 40,000 Mcf of gas to Northern Pipeline. Only the facilities to transport the raw gas produced from the 11 wells in the Eldorado field to the Eldorado processing plant owned by Sinclair are at issue in this case.

The proposed sale of gas by Sinclair from the Eldorado field required the construction of a gathering system to a centrally located point in the field and an 11 mile pipeline from this point to the processing plant. The construction of this

---

2. 18 C.F.R. §§ 157.23–28 (1961) (Filings by producers and gatherers of natural gas which are also natural gas companies). Regulation 157.28 reads as follows:

§ 157.28 Temporary authorizations.

Upon the filing of an application for a certificate of public convenience and necessity under §§ 157.23 to 157.27, there also having been filed a rate schedule under §§ 154.91 through 154.102 of this chapter, an independent producer, in the event of an emergency that does not involve immediate danger to life or property, may initiate the sale or transportation of natural gas in interstate commerce and continue such sale or transportation pending final Commission action under sections 4 and 7 of the Natural Gas Act and without prejudice to such rate or other condition as may be attached to the issuance of the certificate: *Provided, however,* That this temporary authorization is applicable and available only subject to the following:

(a) It does not apply to termination of any sale or transportation or with respect to service proposed to commence more than 30 days from the date of the filing of the statement required in paragraph (c) of this section.

(b) It shall not apply unless such facilities as may be necessary to enable the purchaser of the gas or the person by whom the transportation is to be performed to accept delivery of such gas from the independent producer have been authorized by the Commission or are exempt from the need of such authorization by virtue of the provisions of § 2.55(d) of this chapter.

(c) As part of its application hereunder, or separately, the applicant independent producer must file or have on file (1) a statement of intention to invoke this section, setting forth the facts constituting the emergency requiring such action, which emergency may include, inter alia, drainage, threatened loss of lease, flaring, economic hardship resulting from payment of shut-in royalties, or similar situations; (2) a statement identifying the contract tendered as the rate schedule intended to be effective for the sale or transportation under this temporary authorization; and (3) a statement describing, generally, the facilities necessary to enable the purchaser to take delivery of the gas proposed to be sold or transported.

(d) Notice by the Secretary of the acceptance of the rate filing and the statements made under this section shall constitute a waiver by the Commission of the 30-day advance filing requirements of §§ 154.92(b) or 154.94(b) of this chapter, and the proposed temporary sales or transportation may proceed forthwith.

[Order 193, 21 F.R. 9167, Nov. 24, 1956, as amended by Order 220, 25 F.R. 2363, Mar. 19, 1960]

latter line, which was done at a cost of approximately $250,000, is the subject of the present suit, which alleges an unauthorized grant by the Commission and duplication of facilities. Sinclair·would, as previously indicated, transport the gas 11 miles to its processing plant and then deliver it to Northern Pipeline. If Brooks Gas and Brooks Pipeline transported this additional gas, it would travel 29 miles before being processed; however, because the ultimate purchaser Northern Gas would be the same from either routing and the transmission line of Northern Gas runs in a northwesterly direction, when the gas is delivered by the Mertzon plant it is closer to the consumer than when delivered from the Eldorado plant because the Eldorado connection is 34 miles upstream in the transmission line from the Mertzon plant connection.

On November 30, 1965, the Commission issued public notice of Sinclair's application. On December 22, 1965, Brooks Gas filed a petition to intervene, alleging that the Sinclair line from its central gathering point in the Eldorado field to Sinclair's processing plant duplicated the Brooks Gas facilities.

Because of the delay which would be caused by the intervention of Brooks Gas, Sinclair, by letter to the Commission dated March 18, 1966, requested temporary authorization (pursuant to section 157.28, reproduced in footnote 2, *supra*) to commence the sale of the residue gas to Northern Gas pursuant to its pending application.

Brooks Gas, by letter dated March 28, 1966, opposed Sinclair's request for temporary authorization to the extent that gas would be produced in what Brooks Gas denominated as the "Velrex-Eldorado Field." The use of this name—not accurately descriptive of any field—resulted in confusion on the part of the Commission. Sinclair, on May 19, 1966, indicated, to further support its request for temporary authorization, that it was suffering drainage by Brooks Gas wells, threatened loss of leases, and economic hardship resulting from the payment of shut-in royalties, because of the lack of

authority to transport and sell the gas from wells it owned or operated in the Eldorado field. On the same day, the Commission issued a temporary authorization permitting Sinclair to sell gas to Northern Gas but included ambiguous language that such authorization related to production from fields other than the "Velrex-Eldorado Field." On May 25, 1966, Sinclair requested that the Commission review its action to clear up the ambiguity, reiterating that there was no field named "Velrex-Eldorado" and emphasizing that it was suffering drainage and economic hardship from the payment of shut-in royalties.

On June 6, 1966, Brooks Gas responded to Sinclair's renewed request. On June 17, 1966, the Commission amended the temporary authorization by granting to Sinclair the temporary authority to sell residue gas produced in the Eldorado field as proposed in its application. The Commission stated:

Based upon the information contained in the statement filed May 25, 1966, in Docket No. CI66–410 and the response thereto of Brooks Gas Corporation dated June 6, 1966, the temporary certificate issued May 19, 1966, in Docket No. CI66–140 is hereby amended by deleting therefrom the second paragraph thereof and substituting therefor the following:

For the reasons set forth in the separate order issued this day, a hearing on the application is required to consider *inter alia* the contentions made by the intervener, Brooks Gas Corporation. In the meantime an emergency exists since gas taken in the Eldorado Field from lines through which·Brooks performs a transportation service are (sic) draining gas from. leases of the applicant as well as other producers who have contracted to sell to the Applicant. Accordingly, a temporary certificate is hereby issued to Sinclair Oil & Gas Company (Operator), *et al.*, to sell gas as proposed in the application for certificate, Docket No. CI66–410.

The temporary authorization also required Sinclair to amend its producer application, stating:

This temporary certificate shall not become effective until such time as Sinclair shall amend its application to request authorization for the construction and operation of any facilities necessary to transport gas produced and purchased from other producers in the Eldorado Field to the Eldorado Processing Plant from which plant it appears that natural gas will be sold to Northern in interstate commerce.

On June 23, 1966, Sinclair filed the required amendment under regulations applicable to independent producers but without conceding that its proposed behind-the-plant facilities would be subject to regulation as pipeline facilities and expressly reserving its right to demonstrate the nonjurisdictional nature of such facilities.

On May 23, 1966, as amended on August 5, 1966, the Commission granted Northern Gas and Northern Pipeline temporary certificates under section 157.17 of the regulations to receive and transport the residue gas to be purchased from Sinclair pursuant to temporary authorization in Docket No. CI66–410. These pipeline temporary certificates were based upon the emergency faced by Sinclair. Petitioner did not seek review of these temporary certificates issued to Northern Gas and Northern Pipeline.

Pursuant to the grant of authority under regulation 157.28, Sinclair completed facilities to connect the wells and ran the 11 mile pipeline to the processing plant.

Petitioner asks this court to reverse the Commission's granting of the temporary authorization pending a full hearing. Concurrently with its amendment of the temporary certificate, the Commission ordered formal hearings on Sinclair's application, as amended, for a permanent certificate, and it consolidated with it the pipeline applications of Northern Gas and Northern Pipeline. Brooks Gas and Brooks Pipeline were allowed to intervene in those proceedings. Those hearings have been completed and a permanent certificate of public convenience and necessity was issued on June 20, 1967, authorizing construction of the facilities (which are here in controversy), transportation, and sale of the gas. The Commission denied, on August 7, 1966, the joint application by Brooks Gas and Brooks Pipeline for a rehearing of the amended order granting Sinclair a temporary certificate and challenging the claim of drainage but not that of shut-in royalties.

### III

Brooks Gas, the sole petitioner here, claiming to be a party aggrieved under 15 U.S.C. § 717r(b) (1963), brought this suit to review the granting of the temporary authorization by the Commission to Sinclair to transport and sell gas from the Eldorado field. For purposes of challenging the temporary grant, we find that Brooks Gas was so aggrieved. They were a party to the proceedings before the Commission. They were aggrieved by the order because of both the alleged duplication of facilities and the alleged unlawful official action which they now challenge. National Coal Association v. Federal Power Comm., 89 U.S.App.D.C. 135, 191 F.2d 462 (1951).

The petitioner in this case claims that the temporary authorization granted under the regulation should not include authority to construct the 11 mile pipeline built by Sinclair, because such authorization must be based on the standards set forth in the proviso in section 7(c) of the Act and as interpreted in Algonquin Gas Transmission Co. v. Federal Power Comm., 201 F.2d 334 (1st Cir. 1953). Since the standards set forth in the statute for granting such temporary authorization; e. g., "cases of emergency, to assure maintenance of adequate service or to serve particular customers, * * * pending the determination of an application for a certificate," [3] have concededly not been met, they would have us reverse the Commission.

3.  15 U.S.C. § 717f(c) (1963).

Sinclair and petitioner alike, as independent producers, have made investments in production facilities which, under section 1(b) of the Act,[4] require no Commission authorization. Similarly, they have made investments in extraction plants which also require no Commission authorization. No question is raised that Sinclair is not an independent producer and subject to and controlled by regulations applicable to producers, or that regulation 157.28 is invalid,[5] or that the Commission does not have jurisdiction over producer activities.[6]

4. 15 U.S.C. § 717(b) (1963).

5. This regulation was upheld in Public Service Commission of State of New York v. Federal Power Comm., 117 U.S. App.D.C. 195, 327 F.2d 893 (1964), where a similar argument was made. The court there said:

> [The Public Service Commission of New York] contends that the Commission has no authority to issue temporary certificates to independent producers where the claimed emergency is due to drainage, threatened loss of lease, flaring, and economic hardship resulting from the payment of shut-in royalties. It contends that the sole provision for temporary certificates is found in the following language of Section 7(c) of the Act:
>
> "[T]he Commission may issue a temporary certificate in cases of emergency, to assure maintenance of adequate service or to serve particular customers, without notice or hearing, pending the determination of an application for a certificate. * * *"
>
> It is not disputed that the present emergency grants were not "to assure maintenance of adequate service or to serve particular customers;" but the Commission counters that these restrictions apply only to temporary certificates issued to pipelines. It points out that emergencies affecting independent producers, sufficient to authorize the issuance to them of temporary certificates, may arise from "drainage, threatened loss of lease, flaring, economic hardship resulting from payment of shut-in royalties, or similar situations." These are the criteria set forth in Commission Regulation § 157.28(c), promulgated in 1956, upon the basis of which the Commission has been issuing temporary certificates to independent producers.
>
> The question is whether Regulation § 157.28(c) is valid. We think it is. The power to issue temporary certificates is not limited to emergencies "to assure maintenance of adequate service or to serve particular customers." As the legislative history makes clear this language has a special relationship to pipelines. The court should not construe this affirmative grant of authority as excluding authority in other situations if its exercise finds justification in the Act as a whole. As to this, Section 16, [15 U.S.C. § 717o (1963)] relied upon to support Regulation § 157.28(c), empowers the Commission to perform any and all acts and to prescribe, issue, make, amend or rescind such orders or regulations as it may find necessary or appropriate to carry out the provisions of the Act. (footnotes omitted.)

6. The court in the *Public Service Commission of New York* case, note 5, *supra*, discussed this jurisdiction as follows:

> When the decision of the Supreme Court in Phillips Petroleum Co. v. [State of] Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), held that the Commission could no longer refuse to assume jurisdiction over independent producers it was required to adjust its administrative machinery to the necessity of acting upon thousands of new applications for certificates by such producers to enable them to sell their gas for resale in interstate commerce. In meeting this responsibility it was reasonable for the Commission to adopt means comparable to those the Act expressly gave in the case of pipelines for insuring that the public interest would not be impaired by the lapse of time between the filing of a producer's application for a certificate of public convenience and necessity and the Commission's final action on the application. To do this it was necessary for the Commission to adjust its emergency criteria to the nature of gas production rather than to the nature of gas transportation. We assume Congress contemplated from the beginning that the Commission's jurisdiction extended to independent producers, although it set forth no clear criteria to govern the issuance of temporary certificates to them. But we are not required to assume also that it contemplated limiting such certificates to pipelines, even if the restrictive language of Section 7 applies only to pipelines. No provision in the Act is to the effect that temporary certificates may be issued only to pipelines; and Section 16, certainly when read with Sec-

Petitioner would distinguish the *Public Service Commission of New York* case, 117 U.S.App.D.C. 195, 327 F.2d 893 (1964), on the basis that Sinclair constructed a pipeline and that regulation 157.28, although valid, does not allow the construction of a pipeline on a grant of temporary authorization under this regulation. In this case, our holding is not that section 7(c) of the Act is not applicable to this "pipeline" but rather that these facilities cannot by their very nature be pipelines, and because of this, section 7(c) is not applicable. Regulation 157.28 runs to independent producers and grants the Commission authority to grant to the producers, in the event of a producer emergency, permission to sell or transport natural gas pending final Commission action on their pending applications, provided the conditions set forth therein are met. To interpret the word "transportation" as used in this regulation as meaning only over preexisting lines would be a stilted and strained construction.[7] To read this section as having implicit in it the stringent requirements set forth under section 7(c) of the Act for the issuance of temporary authorization under this regulation would be to render it ineffectual.

The *Public Service Commission of New York* case does not precisely cover the point here raised. However, once finding the authority for the issuance of such regulations—as was done in that case—our task becomes one of determining only whether the word "transportation" authorizes construction of facilities, including this 11 mile "pipeline" necessary to implement the grant of the authorization.

The regulation expressly provides for "transportation" under its authority, and 157.28(c) expressly provides that an independent producer may invoke the temporary authorization for those emergencies thereunder covered. Since temporary authority for emergencies may be granted to cover transportation, it must be broad enough to cover a relatively short line from the field to the processing plant, such as is involved in the present case. What invokes the authority of this regulation is not what is done; *e. g.*, the laying of pipe, but rather the reason for which it is done; *id est*, to relieve a legitimate independent producer emergency. There is in this case the necessary allegation to invoke 157.28—an uncontroverted allegation of the economic hardship resulting from the payment of shut-in royalties by an independent producer. What is being presently authorized is not a "jurisdictional pipeline," subject to the Commission's jurisdiction as a pipeline, but rather a part of a facility over which the Commission has only indirect control.[8] Further, that prejudice which would flow from a temporary grant in a "competing grant" situation, a so-called *Ashbacker* problem,[9] is not present here, because mutual exclusivity is not involved. The Commission has no facility rights to grant in this case. Here, where a producer itself faces an emergency there is no authority in the Commission for granting rights to an alternative party, because the producer decides and determines for itself what its

tion 7, supports their issuance to independent producers under emergency conditions defined by Regulation § 157.28 (c).

7. Petitioner asserts that 157.28(b) forbids granting temporary authority to producers unless the facilities through which the gas would flow have already been authorized. Though ambiguous, this provision requires that only the facilities of a purchaser or the person transporting the gas, in this case Northern Pipeline, be authorized. See the text of the rule as first promulgated, Order 21, Fed.Reg. 9166–67, and the subsequent amendment at contracting this requirement, Order 220, 25 Fed.Reg. 2363–64.

8. It would seem that as long as the Commission regulates the price at which the residue gas is sold to interstate pipeline companies at the outlet of the processing plant, as it does here, it might be unnecessary from the standpoint of protecting the consumer to consider on a request for a temporary authorization any investment in behind-the-plant facilities.

9. Ashbacker Radio Corp. v. F. C. C., 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945).

facilities are and will be if it does not prevail. The producer, not the Commission, here decides what is done with the gas. The traditional prejudice flowing from granting temporary authorization is simply not present in this case.

The Commission made the grant of temporary authority contingent upon Sinclair's amending its permanent application, specifically requiring it to apply for authorization to construct facilities. Such a requirement might seem inconsistent with the position which we now take, and which the Commission took, in granting such temporary authority. Our view is that out of an abundance of caution the Commission wanted to make it plain that at the hearing for a permanent certificate it would have before it Sinclair's application for a complete resolution on the merits unaffected by any temporary grants. This is, of course, as it should be.

The regulation distinguishes between pipeline companies and independent producers,[10] and to say that the Commission need treat an independent producer having a specified producer emergency as a pipeline company because it seeks to lay pipe to relieve itself of such emergency is unnecessary.

█ The factor which triggers 157.28 is one of record in this case; *id est,* an allegation of the payment of shut-in royalties by an independent producer. Because the facilities involved are those of one particular company, with no alternative right being granted by the Commission, the *Ashbacker* argument that no facilities should be authorized which would prejudice a subsequent hearing on the merits in favor of the temporary grantee is not valid in this case. The question is merely one of statutory construction. The Commission has in the past allowed such "pipelines" to be built as part of a temporary authorization. The wording of the regulation permits

such interpretation, and the alternatives would be so restrictive as to effectively destroy such a regulation's usefulness in alleviating those emergencies therein enumerated. Our view is that a producer having a specifically enumerated producer emergency may, as part of the authorization under regulation 157.28, lay behind-the-plant pipe of the length here involved to transport the gas so as to alleviate its emergency. The Commission action shows clearly, as do the facts, that these facilities are normal behind-the-plant facilities for an independent producer. The Commission action is therefore

Affirmed.

---

10. An independent producer is defined in regulation 154.91 as:

    (a) * * * [A]ny person as defined in the Natural Gas Act who is engaged in the production or gathering of natural gas and who sells natural gas in interstate commerce for resale, but who is not engaged in the transportation of natural gas (other than gathering) by pipeline in interstate commerce.